# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

LORIE FEISTL,                                        :

        **Plaintiff**                            :       CIVIL ACTION NO. 3:14-0491

        **v.**                                       :

                                                  **(JUDGE MANNION)**

**LUZERNE INTERMEDIATE UNIT,**             :
**ANTHONY GRIECO, RONALD**
**MUSTO, GREG KOONS, BETTY**               :
**JEAN SEGEAR, and KIM**
**GEISINGER,**                              :

        **Defendants**                        :

FILED
SCRANTON

APR 0 6 2018

Per_____
DEPUTY CLERK

## <u>MEMORANDUM</u>

Pending before the court is the defendants' motion for summary judgment. (Doc. <u>79</u>). Upon review of the defendants' motion and related materials, the motion will be **GRANTED IN PART** and **DENIED IN PART** as further discussed herein.


## I.    PROCEDURAL HISTORY

The plaintiff filed the instant action on March 14, 2014, in which she raises several claims relating to her employment with the Luzerne Intermediate Unit. (Doc. <u>1</u>). An amended complaint was filed on October 17, 2014, (Doc. <u>24</u>), and a second amended complaint filed on March 31, 2015. (Doc. <u>52</u>). By memorandum and order dated March 24, 2016, the court ruled upon a motion to dismiss the plaintiff's second amended complaint. In doing

so, the following claims remain:

- Count One - Illegal Search - 42 U.S.C. §1983, ("§1983"), against the individual defendants;
- Count Two - Illegal Seizure - §1983, against the individual defendants;
- Count Three - Due Process - §1983, against the individual defendants;
- Count Six - Failure to Accommodate - Section 504 of the Rehabilitation Act, ("Section 504"), against defendant LIU;
- Count Seven - Retaliation - Section 504, against defendant LIU;
- Count Ten - Family Medical Leave Act, ("FMLA"), Interference, against all defendants;
- Count Eleven - FMLA Retaliation, against all defendants;
- Count Fourteen - Unlawful Discrimination on the Basis of Disability in Violation of the Americans with Disabilities Act, ("ADA"), against defendant LIU;
- Count Fifteen - Unlawful Retaliation in Violation of the ADA, against defendant LIU;
- Count Sixteen - Unlawful Discrimination on the Basis of Disability in Violation of the Pennsylvania Human Relations Act, ("PHRA"), against defendant LIU and defendants Grieco, Musto, Koons and Segear; and
- Count Seventeen - Unlawful Retaliation in Violation of the PHRA, defendant LIU and defendants Grieco, Musto, Koons and Segear.

(Doc. 73, Doc. 74).

On May 31, 2016, the defendants filed the pending motion for summary judgment, (Doc. 79), along with a brief in support, (Doc. 80), and a statement of material facts, (Doc. 82). The plaintiff filed a brief in opposition to the defendants' motion for summary judgment on July 12, 2016, (Doc. 87), along with a response to the defendants' statement of material facts, (Doc. 88), and exhibits, (Doc. 89 through Doc. 109). On August 5, 2016, the defendants filed

a reply brief in support of their motion for summary judgment. (Doc. 112).

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## III. DISCUSSION

Upon review of the defendants' statement of material facts and the

4

plaintiff's response thereto, the plaintiff, Lorie Feistl[1], was employed by the Luzerne Intermediate Unit, ("LIU"), as an Itinerant Special Education Teacher at the Alternative Learning Center, ("ALC"). After four years of satisfactory performance evaluations, beginning in 2010, the plaintiff's performance evaluations began to decline, resulting in her being placed on a Performance Improvement Plan, ("PIP").[2] Upon request, on January 22, 2013, the plaintiff was granted intermittent leave under the FMLA.[3] In March 2013, the plaintiff was again placed on a PIP.

On April 3, 2013, at the end of the day, the plaintiff left her tote bag in the office where she works, which was also used by others for conferences and meetings. The plaintiff's bag contained the medications Xanax, prescribed to the plaintiff, and Adderall, prescribed to the plaintiff's son.

---

[1]The plaintiff is now Lorie Kneller. However, the parties continue to refer to the plaintiff by her former sur-name and have not moved to amend the caption of the complaint. The court will therefore continue to refer to the name under which the instant action was filed.

[2]The plaintiff agrees that her performance evaluations began to decline, but disputes that her actual job performance declined. Instead, the plaintiff attributes her declining performance evaluations to her disclosure of her disabilities and request for FMLA leave. Specifically, the plaintiff testified that, in 2010, she requested and was granted one week of non-paid leave due to chronic back pain. Her leave tracking report for 2010-2011 indicates that she used intermittent FMLA leave totaling 14.75 days.

[3]The plaintiff disputes this statement only to the extent that she had originally been granted FMLA leave in 2010.

5

At all relevant times, Betty Jean Segear, ("defendant Segear"), was the Dean of Students with the ALC. On the day the plaintiff left her bag behind, defendant Segear heard a noise and entered the office where the plaintiff was assigned.[4] At this point, there are a number of facts in dispute. The parties dispute whether the office was locked at the time, with the plaintiff testifying that she locked the room when she left, and defendant Segear testifying that the door was unlocked when she entered. The parties further dispute whether there was a student in the room when defendant Segear entered. Defendant Segear testified that there was, while the plaintiff testified that a student could not have entered the room because of the locked door. In addition, the plaintiff testified that no such student has been identified or otherwise disciplined for being in the office without permission. The plaintiff further notes that, at least one defendant, Mr. Koons, testified that defendant Segear entered the room after the school day had ended and, therefore, no students would have been present in the school. Further disputed is the visible contents of the plaintiff's bag which was left behind. Defendant Segear testified that the previously identified medication bottles were clearly visible on the top of the bag, while the plaintiff testified that she had placed the bottles toward the bottom of the bag in a pocket. However, there is no dispute that, upon finding the plaintiff's

---

[4]Although the plaintiff provides several responses to this statement, she does not deny that Ms. Segear entered the office upon hearing a noise. (Doc. 88, ¶ 10).

bag, defendant Segear locked the door to the office and proceeded to contact Ronald Musto, ("defendant Musto"), ALC Principal, and Anthony Grieco, ("defendant Grieco"), Executive Director. Defendant Segear was instructed to secure the bag in defendant Musto's office. At some point, defendant Segear testified that defendant Geisinger looked through the plaintiff's bag for other pill bottles in her presence.

Defendant Koons testified that the LIU Administration was concerned about the situation with the medications left in the plaintiff's bag because students could potentially have contact with the medications.[5] Defendant Koons further testified that when staff members need to bring medications to school, they are expected to keep the medications locked in a secure location, which would be somewhere the students would not have any access. In the plaintiff's case, she was instructed by LIU Administration to keep her medications either in her purse or in her car.[6] The plaintiff testified that it was

---

[5]Citing to her own testimony, as well as that of defendant Koons, the plaintiff disputes this fact stating that the defendants knew that students would not have access to the medication bottles in the plaintiff's locked classroom. Upon review, the testimony of defendant Koons cited by the plaintiff indicates that whether a room would be locked would "depend[ ] on the teacher", and that there "could be a classroom here and there" that would not be locked during the day. Defendant Koons provided no testimony coinciding with the plaintiff's statement.

[6]The plaintiff states that the defendants did not provide her with a secure area in which to keep her medication, but admits that she was instructed to
(continued...)

7

her understanding that she was permitted to keep her medications in her bag in her locked office and contends that she complied with those directives. The plaintiff testified that she placed the medications in her tote bag at home because she knew it was unsafe for her child to have contact with the medications, and she further testified that she knew it would be unsafe for her students to have contact with the medications at school.

After the plaintiff's bag was taken, LIU Administration turned it over to the police. On April 4, 2013, the day after the discovery of the plaintiff's bag, a meeting was held with the plaintiff, defendant Musto, defendant Koons, and the plaintiff's union representative. The plaintiff was informed at the meeting that she was suspended with pay pending an investigation into the matter. Ultimately, the medications were determined to be properly prescribed and the plaintiff was informed that she could pick her bag up with the police.[7]

To complete its investigation, the plaintiff and her union representative were asked to meet on April 8, 2013 with LIU administrators, including defendants Koons and Grieco, and the LIU's labor attorney, John Audi.[8] At the meeting, the plaintiff was questioned as to whether there was any physical

---

[6](...continued)
keep her medications either in her purse or in her car.

[7]Although the plaintiff disputes this statement, she provides no basis for the dispute or citation to any contrary information in the record.

[8]See n.7.

and/or medical problems contributing to her continued deficient work performance. She indicated that she had a number of autoimmune deficiencies effecting her ability to perform her job appropriately. The plaintiff stated that she had difficulty with prolonged standing or sitting and needed to stop and stretch when leaning over a desk to assist a student. The plaintiff was provided with an opportunity to discuss what accommodations would be needed to perform the essential functions of her position. The plaintiff indicated that she would need a quiet room/workspace and a location to secure her current medications. The plaintiff provides that, at the suggestion of the defendants' attorney, a cart with wheels was recommended as an accommodation. The defendants issued a letter that same day indicating that the LIU would implement the requested accommodations to help alleviate the plaintiff's medical concerns. Although the plaintiff admits that she was given a quiet space to work, she denies that she was given a place to store her medications. Because any concern of the District that the plaintiff had inappropriately used and/or abused drugs in the school had not been founded, the plaintiff was permitted to return to work on April 9, 2013, without any loss of pay.

The defendants' documentation provides that on April 15, 2013, defendants Segear, Koons and Musto met to discuss reports made to

defendant Segear that the plaintiff had made threatening comments.[9] Specifically, an employee, Krista Mehallic[10], provided a statement that the plaintiff told her that she would "shoot everyone up" at the school and that the plaintiff would tell her to "wear red" that day. That same day, the defendants' documentation reflects that a meeting was held between defendant Koons and Kerry Spagnuolo regarding another incident with the plaintiff. Ms. Spagnuolo reported that, on April 13, 2013, defendant Geisinger called her stating that she received a call from Ms. Mehallic that the plaintiff had threatened to kill herself by overdosing on pills.[11] Ms. Spagnuolo gave defendant Geisinger the plaintiff's brother's phone number, after which it was indicated that Children and Youth Services were involved. Afterwards, Ms. Mehallic reported that the plaintiff sent her text messages wherein she threatened to "go cut [herself]" and stated that whoever was responsible for "doing this to me is going to pay with their lives!" The plaintiff disputes these facts and provides that such claims were fabricated by the defendants in order to harass and intimidate her.

---

[9]The plaintiff denies ever having made any threats, but does not dispute that said meeting took place.

[10]This employee's name is spelled in various ways throughout the record. The court uses the spelling provided in the meeting minutes from April 15, 2013.

[11]The court notes that there is no hearsay issue here as each of the involved individuals has provided a statement corroborating the events of the incident.

10

On April 15, 2013, the plaintiff was informed that she was being placed on a paid suspension pending an investigation in to the alleged threats. In conjunction, the plaintiff was given a "Notice of Trespass", instructing her to stay away from LIU faculty, students and property during the investigation. The investigation was ultimately determined to be inconclusive and the plaintiff was informed of this at a meeting on May 6, 2013. By letter dated May 8, 2013, a summary of the May 6, 2013 meeting was provided to the plaintiff and she was informed that she was being required to complete a physical and mental health evaluation pursuant to the Pennsylvania School Code, Section 1418, as a condition of returning to work. The plaintiff subsequently provided the LIU with a physician's note dated August 2, 2013, stating that she was in good health and able to return to work.

In or around August 2013, the plaintiff requested to be placed to work at a different location. In response to the plaintiff's request, by letter dated August 16, 2013, the plaintiff was given two options. The plaintiff could either remain at ALC as an Itinerant Special Education teacher or go to the Fairview Elementary School in the Crestwood School District as an Autistic Support Special Education Teacher. The plaintiff declined the alternative assignment offer.

By e-mail dated January 2, 2014, the plaintiff was informed that the last day of her intermittent FMLA would be January 21, 2014, twelve months after

its start date. The plaintiff was directed to contact the Human Resources Coordinator if she had any questions or concerns in this regard. After being informed of the expiration date of her FMLA leave, the plaintiff took additional leave time and did not call off prior to taking the leave.[12] Between January 30, 2014 and May 1, 2014, the plaintiff had 26 days of unexcused absences with 20.5 being taken without following LIU's call-off procedures.[13] The plaintiff did not present extraordinary circumstances that would prevent her from complying with LIU's call-off procedures. In the meantime, in February 2014, the plaintiff was again placed on a PIP for performance issues.

By letter dated May 5, 2014, the plaintiff was informed that the LIU Administration was contemplating recommending her dismissal from employment. A Loudermill hearing was scheduled for May 12, 2014, at which a notice of charges against the plaintiff was presented. However, the plaintiff chose not to go.

By letter dated August 6, 2014, the plaintiff was provided a Notice of Dismissal Charges and Right to a Hearing.[14] The plaintiff chose to waive her

---

[12]The plaintiff disputes this statement claiming only that her leave should have been FMLA protected. She does not dispute, however, that she did not call off when taking leave.

[13]See n.12.

[14]The plaintiff admits this, but indicates that she was not provided with
(continued...)

hearing before the LIU Board of Directors. Thereafter, the plaintiff attended the first day of her arbitration grievance hearing, but then stopped attending the hearings. A settlement agreement in the record dated June 24, 2015 reflects that the plaintiff abandoned the arbitration proceedings and indicated no interest in participating in further proceedings. The parties agreed that the plaintiff would receive a lump sum payment, her grievances would be withdrawn, and her suspension and dismissal would remain undisturbed.

In their motion for summary judgment, the defendants argue that they are entitled to summary judgment on Counts One (Illegal Search) and Two (Illegal Seizure) of the plaintiff's second amended complaint. The defendants argue that the Fourth Amendment is only applicable if the plaintiff (1) can "demonstrate that [she] personally has an expectation of privacy in the place searched," and (2) "that [her] expectation of privacy is reasonable; i.e., one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings, that are recognized and permitted by society." Minnesota v. Carter, 525 U.S. 83, 88 (1988) (citations omitted). In the context of the Fourth Amendment, the defendants argue that a search of articles in "plain view" does not violate the Fourth Amendment. See Horton v. California, 496 U.S. 128 (1990).

---

[14](...continued)
attachments containing specific information regarding the allegations against her.

Here, the defendants provide that the plaintiff left her bag in an office which she shared with others. The defendants further claim that the plaintiff had Adderall and Xanax in her bag, and that defendant Segear found the bag with the prescription medications in plain view. The defendants argue that these facts would not allow a reasonable factfinder to conclude that the plaintiff had a reasonable expectation of privacy with respect to the medications in her bag and that, in fact, no search within the meaning of the Fourth Amendment occurred.

In considering the defendants' argument, there is a question of fact as to whether the prescription pill bottles were, in fact, in plain view. While this is the contention of defendant Segear, the plaintiff claims that she placed the bottles in a pocket within her bag, such that they would not have been in plain view. The factual issue of whether the prescription bottles were in plain view defeats the defendants' initial argument that no search occurred within the meaning of the Fourth Amendment because the articles were in plain view.

The defendants further argue that, even if the plaintiff had an expectation of privacy, the reasonableness of the search entitles them to summary judgment. To this extent, the defendants argue that the Court in O'Connor v. Ortega, 480 U.S. 709 (1987) explained that to determine whether a search is reasonable, a two-part process must be considered: (1) "one must consider whether the action was justified at its inception" and (2) "one must

determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place". Id. at 726. The Court in O'Connor stated that a search will be "justified at its inception" where there were "reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file." Id.

The defendants argue here that any search of the plaintiff's bag was justified at its inception. In so arguing, the defendants claim that the medications at issue were found by defendant Segear on the top of the plaintiff's bag in a shared office space within the reach of a student. The defendants argue that the need to retrieve the medication left behind by the plaintiff, which was allegedly within the reach of school children, is a legitimate work-related need. Again, however, the defendants' argument is based upon a number of disputed facts. There is a dispute as to whether the medications were in plain view on the top of the plaintiff's bag. There is also a dispute as to whether the bag was within the reach of a student, as the plaintiff claims that the office was locked and was not accessible to students, and that students would not have been in the building in any event because the bag was left after school hours. Therefore, there is a question as to whether the search was justified at its inception.

15

Based upon the above disputed facts, necessarily, there is a question as to whether the search conducted was reasonably related in scope to the circumstances which justified the interference in the first place. The defendants argue that the reason for the search was out of a concern that students would have access to the medications and that the plaintiff was bringing medications onto school property that were not prescribed. Because the medications were purportedly found within the reach of students, the defendants provide that LIU Administration questioned whether the medications were legitimately prescribed to the plaintiff[15] and that there is no evidence that the scope of the investigation exceeded the objectives that motivated the search in the first place. The factual disputes about where the medications were and who had access to those medications preclude summary judgment on this basis.

Citing to Pitner v. Murrin, 812 F.Supp.2d 661, 672 (E.D.Pa. 2008), the defendants also argue that there was no "seizure" of the prescription medications because the medications were discovered in plain view. Again, there is a dispute as to whether the medications were in plain view which precludes summary judgment on this basis. Moreover, similar to the search

---

[15]This is of questionable logic, at best. Simply because the plaintiff had prescription medications in her bag, even if in plain view, does not give rise to the conclusion that those medications were not legitimately prescribed to the plaintiff.

16

claim, the defendants argue that, even if a seizure took place, the seizure was reasonable at its inception because the medications were taken for safety reasons. For the reasons set forth above, summary judgment will be denied as to the seizure claim as well.

The defendants next argue that they are entitled to summary judgment on Count Three (Due Process) of the plaintiff's second amended complaint wherein the plaintiff alleges that the defendants violated her rights when they confiscated her bag without cause and without due process.[16] Here, the defendants argue that, because the removal of the plaintiff's bag was necessary and reasonable and the plaintiff did not allege any harm from having her bag turned over to the police, she suffered no due process violation. As discussed above, there are questions of fact with respect to the reasonableness of the seizure of the plaintiff's bag which precludes summary judgment on that claim. Because the defendants rely on the reasonableness of the seizure to support summary judgment on the due process claim, the defendant's motion for summary judgment on Count Three (Due Process) will

---

[16]Originally believing that the plaintiff's due process claim in Count Three was based upon her termination, the defendants argued that the plaintiff failed to state a claim for violation of due process because she received notice and an opportunity to be heard in relation to her termination. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985). The court would agree with this argument. The plaintiff has indicated however that her due process claim is based upon the seizure of her medication.

be denied as well.

Next, the defendants argue that the individual defendants are entitled to summary judgment. To this extent, the defendants argue that there is no evidence that defendant Geisinger had anything to do with the actions the plaintiff claims violated her constitutional rights, and the plaintiff has presented no evidence that any individual defendant conducted a search or seizure of her bag or medications.

As to this argument, the testimony of defendant Segear indicates that defendant Geisinger searched through the plaintiff's bag after it was discovered for other medication bottles. Moreover, the record indicates that defendant Segear took the bag at the direction of defendants Musto and Grieco and placed it in defendant Musto's office, after which it was turned over to the police. Questions of fact related to the individual defendants' involvement and the circumstances surrounding the discovery and confiscation of the bag preclude summary judgment in favor of the individual defendants.

The individual defendants also argue that they are protected by the doctrine of qualified immunity because there is no authority establishing that they violated the plaintiff's constitutional rights. The doctrine of qualified immunity provides that government officials performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly

established statutory or constitutional right [ ] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); Saucier v. Katz, 533 U.S. 194, 201-02 (2001). Qualified immunity provides not only a defense to liability, but "immunity from suit." Hunter v. Bryant, 502 U.S. 224, 227 (1991); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). In considering whether a defendant is entitled to qualified immunity, the court must analyze two factors: 1) whether the plaintiff has shown facts that make out a constitutional rights violation, and if so, 2) whether those rights were "clearly established" at the time of the incident. Pearson v. Callahan, 555 U.S. 223 (2009); see also Taylor v. Barkes, ___ U.S. ___, 135 S.Ct. 2042, 2044 (2015) ("Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.") (citation omitted). Here, the court has already determined that there are questions of fact as to whether the plaintiff's Fourth Amendment rights were violated. Therefore, the individual defendants are not entitled to qualified immunity and summary judgment will be denied on this basis.

The defendants seek summary judgment on Counts Six (Failure to Accommodate - Section 504 of the Rehabilitation Act), Fourteen (ADA - Discrimination), and Sixteen (PHRA - Discrimination) arguing that the plaintiff has not established that she was "otherwise qualified" to perform the essential

functions of her job.[17] The defendants argue that, after it was determined that the plaintiff was ineligible for FMLA leave, she continued to take days off without calling prior to her absences. Between January 30 and May 1, 2014, the plaintiff had 26 days of unexcused absences, with 20.5 taken without providing the appropriate notification via call-off procedures. In this court's March 24, 2016 opinion addressing the defendants' motion to dismiss, the court allowed the plaintiff's claims to proceed finding that a plaintiff may be "otherwise qualified" when the requested accommodation is a finite period of unpaid leave. The defendants argue at this point, however, that the plaintiff has not presented any evidence that she requested a finite period of leave time to accommodate for her disability. The defendants also argue that there is no evidence that extraordinary circumstances caused the plaintiff to take days off without following the appropriate procedures. Because the plaintiff never requested a reasonable accommodation of continued leave and continued to take indefinite unauthorized leave time without following the proper procedures, the defendants argue that she was not "otherwise

---

[17]Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C.A. §794. Moreover, under the ADA and PHRA, the plaintiff must establish that she was "otherwise qualified". See Showers v. Endoscopy Ctr. of Cent. Pennsylvania, LLC, 58 F.Supp.3d 446, 460 (M.D.Pa. 2014).

qualified" and they are entitled to summary judgment on the foregoing counts.

With regard to Section 504, in Southeastern Community College v. Davis, 442 U.S. 397, 406 (1979), the Court said: "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of [her] handicap." Later, the Court noted: "In the employment context, an otherwise qualified person is one who can perform 'the essential functions' of the job in question." School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 287 n.17 (1987). The ADA defines "a qualified individual with a disability" as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8). Regularly attending work is an essential function of any job. See e.g., Flory v. Pinnacle Health Hosp., 2008 WL 2782664 (M.D.Pa. July 15, 2008), aff'd sub nom. Flory v. Pinnacle Health Hospitals, 356 Fed. App'x 872 (3d Cir. 2009). "[W]hether suit is filed under the Rehabilitation Act or under the [ADA], the substantive standards for determining liability are the same". McDonald v. Commonwealth of Pennsylvania, 62 F.3d 92, 94 (3d Cir. 1995).

In this case, while the record demonstrates that the plaintiff had requested other accommodations, the plaintiff has presented no evidence that she had requested any period of unpaid leave after she was informed that her FMLA leave had expired. The record demonstrates that the plaintiff was

21

informed on January 2, 2014, that her FMLA leave would expire on January 21, 2014, twelve months after it began. She was directed to contact the Human Resources Coordinator if she had any questions or concerns in this regard. The plaintiff has produced no evidence that she ever did so. Instead, the record demonstrates that between January 30, 2014 and May 1, 2014, the plaintiff had 26 days of unexcused absences, with 20.5 of those days being taken without following the proper procedures. In light of this, the court finds that the plaintiff has failed to establish that she was otherwise qualified to perform the essential functions of her job and will grant the defendants' motion for summary judgment on Counts Six (Failure to Accommodate - Section 504 of the Rehabilitation Act), Fourteen (ADA - Discrimination), and Sixteen (PHRA Discrimination) of the plaintiff's second amended complaint.

With respect to the plaintiff's retaliation claims in Counts Seven, Eleven, Fifteen and Seventeen, the defendants argue that, even if the plaintiff could establish a prima facie case of retaliation, she has not presented any evidence that their reasons for terminating her were pretext for retaliation. As such, the defendants argue that they are entitled to summary judgment on the foregoing counts.

The plaintiff's claims of retaliation are subject to the burden shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Shaner v. Synthes, 204 F.3d 494, 499 (3d

Cir. 2000). Under this analysis, the burden is first on the plaintiff to satisfy the elements of a prima facie case of retaliation. Id. at 500. To establish a prima facie case of retaliation, the plaintiff must show: (1) that she engaged in protected activity, and the defendant knew of the involvement; (2) adverse action was taken by the defendant either during or after the protected activity that was sufficient to deter a person of ordinary firmness from engaging in protected activity; and (3) a causal connection between the protected activity and the adverse action. Shaner, 204 F.3d at 494; Hesling v. Seidenberger, 286 Fed. App'x 773, 773-75 (3d Cir. 2008). If the plaintiff establishes a prima facie case of retaliation, then the burden of production shifts to the defendant to advance a legitimate, non-retaliatory reason for the adverse action. Shaner, 204 F.3d at 500. If the defendant satisfies its burden, then the burden of production shifts back to the plaintiff to identify sufficient evidence for a fact finder to conclude that the defendant's proffered reason is pretextual. Id. at 501. Evidence is sufficient if it would permit a factfinder to find that retaliatory animus had a determinative effect on the defendant's action. Id. at 501 n.8. The plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). See also Fakete

23

v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir. 2002). To discredit the defendant's proffered reason, the plaintiff cannot simply show that the defendant's decision was wrong or ill-conceived. The plaintiff must show that there is a genuine dispute as to whether discrimination motivated the defendant's actions. Fuentes, 32 F.3d at 765. The relevant inquiry is the perception of the decision maker, not the plaintiff's view of his or her own performance. Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991) (citations omitted); see also Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509 (3d Cir. 1993) (pretext turns on the qualifications and criteria identified by the employer, not the categories the plaintiff considers important). "[A]t the pretext stage it is not a court's role to 'rul[e]' on the strength of cause for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is' [retaliation]." Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 647 (3d Cir. 2015). If the plaintiff meets her burden of production at the pretext stage, "[the] defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Here, the defendants argue that, even if the plaintiff could establish a prima facie case of retaliation, it has advanced a legitimate, non-discriminatory reason for the plaintiff's termination. To this extent, the defendants argue that

the plaintiff was given notice of her termination based upon her poor work performance and her excessive unexcused absences. The record demonstrates that the plaintiff was placed on PIPs in 2010, 2013 and 2014. Moreover, after she had been advised that her FMLA leave had expired, the plaintiff had 26 days of unexcused absences, with 20.5 being taken without following LIU's call-off procedures. With the defendant having provided a legitimate, non-discriminatory reason for the plaintiff's termination, the burden of production shifts to the plaintiff to establish that the defendants' reasons are pretextual. The plaintiff has not, however, pointed to any evidence in the record to meet her burden. In response to the defendants' proffered reasons for her termination, the plaintiff argues that her work performance did not warrant her placement on the PIPs, but does not at all dispute that she took substantial days of unexcused leave without following the proper procedures. While the plaintiff argues that this leave should have been counted as FMLA leave by the defendants, the FMLA does not provide employees with the right to take leave without following the employer's policies regarding absences, even if those absences occur during a protected leave. See Pellegrinio v. Commc'ns Workers of Am., 478 Fed. App'x 742, 745 (3d Cir. 2012). The plaintiff has not pointed to any evidence that non-protected individuals were treated any more favorably than she was nor that discrimination was, in fact, the cause her termination. Because the plaintiff has failed to establish that the

defendants' proffered reasons for her termination were pretextual, the defendants' motion for summary judgment will be granted with respect to Counts Seven, Eleven, Fifteen and Seventeen.

Finally, as to Count Ten (FMLA - Interference) of the plaintiff's second amended complaint, the FMLA provides, in relevant part, that eligible employees are entitled to 12 work weeks of leave during any 12-month period due to an employee's own serious health condition. 29 U.S.C. §2612(a)(1). In Lichtenstein v. University of Pittsburgh Medical Center, the Third Circuit stated that,

> [w]hen employees invoke rights granted under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" these rights. Nor may employers "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." The former provision is generally, if imperfectly, referred to as "interference" whereas the latter is often referred to as "retaliation."

691 F.3d 294, 301 (3d Cir. 2012) (internal citations omitted). To make a claim of interference under the FMLA, the plaintiff must establish: (1) she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which she was entitled under the FMLA. Johnson v. Cmty. Coll. of Allegheny Cnty., 566 F.Supp.2d 405, 446 (W.D.Pa. 2008); see also Sommer v. The Vanguard Grp., 461 F.3d 397, 399

(3d Cir. 2006).

The defendants argue that they are entitled to summary judgment on the plaintiff's FMLA interference claim because her FMLA leave had expired as of January 21, 2014 and she did not establish that she requested additional FMLA leave for the next 12-month period. Instead, the defendants argue that the plaintiff continued to take leave without authorization. The plaintiff, on the other hand, argues that the defendants do not provide any authority for the proposition that her leave "simply 'expires' upon the one-year anniversary of its commencement".

With regard to the above, when intermittent leave is taken, an employee is entitled to take leave at different times during the year without continually having to re-qualify for such leave and may be taken over such periods in an amount equal to the twelve weeks of leave allowed yearly by the FMLA See McGuiness v. East West Industries, 857 F.Supp.2d 259, 264 (E.D.N.Y. 2012). However, "[a]n employee seeking additional FMLA leave after the expiration of the 12 month period following the initial exercise of intermittent leave, must request and re-qualify for FMLA leave." Id. (citing Roberts v. Ground Handling, Inc., 499 F.Supp.2d 340, 353 (S.D.N.Y. 2007)). In this case, the record establishes that the plaintiff was granted and initially used her intermittent leave beginning on January 22, 2013. Thus, her leave expired twelve months from that date, on January 21, 2014, and the plaintiff was required to request

27

and re-qualify for another 12-month period of intermittent leave. Although the plaintiff was informed that her FMLA leave would expire on January 21, 2014, rather than requesting additional FMLA leave, the plaintiff continued to take unexcused leave. In light of the foregoing, the court finds that there was no FMLA interference and the defendants are entitled to summary judgment on Count Ten of the plaintiff's second amended complaint.

## IV. CONCLUSION

In light of the foregoing, the defendants' motion for summary judgment will be granted in part and denied in part. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: April 6, 2018**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-0491-02.wpd